Bissell, J.
The Arkansas river runs through the city of Pueblo. As originally laid out there were two corporations with which we are concerned which may be designated as South and Central Pueblo. Central Pueblo was a subdivision of the city, platted and laid out by the state and a perpetual right of way and full jurisdiction over all its streets and alleys was granted unto the city. South Pueblo so far as we can gather from the record was laid out either by the heirs or grantees of Nolan to whom congress had granted eleven leagues of ground bordering on the river at that point. It is either conceded or was proven that the land which bordered on the river was included within the grant and the only matter disputed between the parties is as to whether the title of the Nolan heirs or grantees which concededly embraced the lots on the south side of the river, carried those rights to the meander line of the stream as it was surveyed or ran to the thread or middle of the river. The city projected a public improvement which either consisted of or included the building of a levee along the north bank of the stream to protect the city and the property of its citizens from periodical overflows. The improvement as laid out necessitated the taking of certain property. To obtain the requisite title and to determine the proper compensation to the owners the city filed a petition to condemn certain property. The plaintiffs in error, Norris and Whitman, were made defendants and it *292 is with their rights only that we are concerned. The only land which was owned by either of them which the city desired to appropriate was a small piece on the southerly side of fractional lot 27 which Norris owned. The petition neither accurately nor well described it, nor do we find any description in the record to which we can resort for the purpose of stating its accurate boundaries. It is always referred to as a strip colored in pink. The strip is probably so colored in the plat that is found in the record, but this is not such a description or statement of lines as is consistent with the accuracy which ought to be present in all decrees for the purposes of condemnation. In blocks 3 and 4 of Central Pueblo as laid out by the • state, the east and west lines of the lots ran substantially northeast and southwest in direct lines. The westerly boundaries ran in straight lines and east and north which would make all the lots except those which were fractional, parallelograms. The fractional lot 27 which concededly belonged to Norris had for its southerly boundary a line which ran more nearly east and west than in any other direction and intersected the northerly boundary of the lot a short distance from Seventh street as it appears on the plat. The westerly boundary was thirty-one feet long so that Norris’s land as it was conveyed to him by deed from the state was a triangular strip thirty-one feet at one end running to a point at the other and made the section which is described as the part included in pink. Norris’ title to tins particular piece of land is undisputed. The title which the city attempted to acquire by these proceedings was ten feet wide counted from a point beginning at the southerly side of the piece. How far it ran, or how much land it took, we confess ourselves unable to spell out of the record but this difficulty does not embarrass our decision or the real controversy between the parties. The balance of lot 27 and all of lot 28 in block 4, and lots 1, 2, and 3 in block 3 in so far as they are affected by these proceedings, were not included in the grant from the state, and if we are right in our position respecting the limits and extent of the grant, were not public lands nor part of the school *293 sections which were granted by the general government to the state. Title to no part of them is asserted by the plaintiffs in error. They never assumed to buy it of anybody having title, or had any grant from the state which they produced, and whatever claim they had, if any, was that of squatters who built small tenements to rent to their less fortunate neighbors. The real nub of the controversy is over the value of those little houses which Norris and Whitman put up on what they assumed and confessed was either public land or land belonging to the Nolan heirs or their grantees. It is quite true deeds were made by the parties who were in possession but Norris and Whitman conceded that they knew they acquired no right by the transfers and simply used the • deeds as a kind of muniment of title whereby as landlords they might obtain rent from the occupants. Proof was offered in regard to these various matters, and all grants, plats, confirmatory acts of congress and maps of boundaries and description were introduced in evidence. The parties also offered proof respecting the boundary of the Arkansas river which evidence was put in for the purpose of attempting to establish the limits of the grant to Nolan and his heirs. It appears that in 1872 for the purpose of determining the area which was conveyed by the grant and the confirmation, the official surveyor ran the meander of the right bank of the Arkansas river. This seems to have been run for the purpose of determining the northern boundary of the lots included in the grant to Nolan and for the purpose for which meanders are run, and that is, the computation of the amount of land which was conveyed by the grant and assured by the confirmatory act. This survey of Kellogg’s was simply a meander line of; that bank of the river and otherwise than in determining the general course, direction and boundary pf the stream seems to have had no other purpose. A controversy appears to have arisen between the Nolan heirs or their grantees and the state respecting the dividing line between their property and that of the state. In order to settle this question the state authorities directed the engineer who was a state officer to *294 make a survey of the Arkansas river to determine the line between the state lands and lands belonging to Nolan and his heirs and grantees. Pie was directed to make this survey in conjunction with an engineer to be appointed as their representative and this was accordingly done and Stimson on behalf of the state and Nettleton on behalf of the grantees of Nolan and his heirs ran the thread of the river and established its boundaries, and this was known as the Stimson-Nettleton survey. Since that time all owners of land deriving their title from the grant of Nolan and the state have recognized that line as the true boundary between the state lands and those comprised in the Nolan grant. Talcing this line as true, the land which the city proposed to take, and to which the plaintiffs in error asserted a possessory right and whereon ■ they had built their little structures was not public land at all, and the plaintiffs in error never had any title to it, any right of possession, nor could they have acquired one. They built with full knowledge of their want of title, took chances on the duration of their possession and the loss of what they built. This statement excludes the triangular piece of fractional lot 27 which had been granted to Norris. A jury was impaneled to assess the damages. Evidence was put in and the cause submitted to them by sundry instructions and they returned a verdict which was substantially that they assessed the damages of John Norris for the taking of “a portion of fractional lot 27 in block 3 in the former town of Central Pueblo, now part of the city of Pueblo, described in the petition to be thirty-five dollars.” They further assessed the damages of Norris for the talcing of the improvements on the other portion of the lot, to which he had no title, at $115. They assessed Whitman’s damages on lots 2 and 3 in block 3 at $400. In order to explain the discrepancy in the verdict and what would appear to be a discrepancy in the statement of the cause it must be noted that in the course of the trial Whitman offered evidence to show that he made an application to the state land board for a lease on part of the property on which'he had put up the buildings and that the state *295 took his rental for one year. One • of his houses was built before he got the lease, one during its life, and the balance after the state refused to take the rent and notified him that they had no title to the land and no right to lease it. The court instructed the jury that he could not recover for the house which was built before he got his lease; he might for the house which was built during its first year, but was entitled to no compensation for those put up after its termination. When it came to the entry of judgment the court held that the true boundary of the Nolan grant' was the thread of the stream; that Norris and Whitman were entitled to no compensation for the improvements put on the lands after the act of 1887 except as to the one house which Whitman built while his apparent lease was in force. Norris was denied compensation for his improvements because he had built them on the south side of the Stimson-Nettleton survey and therefore on lands which were not public, and there was no provision of statute or of law which would give an occupant of another’s land, compensation for what he might put on it. The court then entered judgment that Norris recover §35.00 “ for fractional lot 27, block 3, being the portion of said lot 27 tinted pink on the plat of Central Pueblo filed in the office of the county clerk and recorder of Pueblo county by the state board of land commissioners.” On this record error is predicated. A great many questions are suggested, many of which we do not propose to decide or consider, as they are not important to the settlement of the controversy. The right of the city to condemn the property is unquestioned. The measure of damages is equally Avell settled. It is likewise accurately established by the decisions of the supreme court that the verdict must conform to the statute in order to be valid. All these matters being so thoroughly and completely determined by the adjudication^ of the supreme court we deem it unnecessary to either review or restate them. It is enough to cite the eases from Avhich counsel and the court can extract Avhat the laAv is and the ordinary course of those proceedings. The Pueblo & Arkansas Valley R. R. Co. v. *296 Rudd et al., 5 Colo. 207; Colo. Cent. R. Co. v. Allen, 13 Colo. 229; Colo. Midland R. R. Co. v. Brown et al., 15 Colo. 194; D. & R. G. R. R. Co. v. Griffith, 17 Colo. 598; Twin Lakes H. G. & C. v. Colo. Midland R. R. Co., 16 Colo. 1; Lamborn v. Bell, 18 Colo. 346; Knoth v. Barclay et al., 8 Colo. 300; 1 Mills’ Ann. Stats, sec. 1732.
According to these decisions and that act the verdict of the jury must contain an accurate description of the land, the value of the property taken, the damages to the residue, and the benefits if any. All these things must be found in the verdict. The supreme court has said that this section is mandatory and not directory, and the failure to include in the verdict those things which the statute requires, is necessarily fatal. We do not intend to determine whether we could correct the verdict under any conditions though we have grave doubts about it, for the reason that the judgment entered on the verdict gives Norris damages for fractional lot 27, block 3, being the portion of lot 27 tinted pink. This is not what the city sought, it is not what it took, it took part of lot 27, block 4; it was not the taking of that for which the jury found the damages. In the first place there is no description of the land at all; the statement of the boundaries of the land as those described in the petition is not good because the jury cannot by implication make the petition a part of the verdict. It is equally fatal to the verdict to describe the land, as land tinted pink because this is no description, and although it might be rendered certain by reference to the plat filed by the state it was subject to so many possibilities of mistake and injustice that error was inevitable. If the judgment had been right we might then have determined whether we could correct the verdict, but the verdict and the judgment both being erroneous, we do not see how it can be upheld.
Norris further complains that the jury found that he had been damaged by the taking of his buildings, and that the court refused to award him any damages therefor. We do not think his contention in this regard is at all supported. In the first place he was not a settler on the public lands within *297 the meaning of the statute. He did not attempt to go upon what he supposed was public domain and acquire title as a settler. He was simply, purely and nakedly a squatter who acquired no title by his acts and was entitled to no compensation if the city appropriated the land to which he had no title when he put up his buildings. In any event, his improvements at that point were subsequent to the act of 1887, which would probably bar him even if we conceded the land to be school land. We do not believe that Norris would come within the description of a settler whose improvements are protected. These suggestions are thrown out more by way of answers to the argument of counsel than as direct decisions on the proposition, and they perhaps may be open a little to the suggestion that they are obiter to what we decide because we shall ultimately hold this land was never public land, and Norris could in no event acquire a right to compensation for what he put on it at the time and under the circumstances existing when they were made.
Whitman complains because he only got compensation for one building, not for the one which was put up before he got his lease nor for those which were put up afterwards. We do not think that Whitman is in any condition to complain of the judgment. As we look at it, he got more than he was entitled to any way. He was clearly not entitled even if the lands were public lands to pay for the structure put up before he got his lease, nor for those which he put up after he was notified that the lands were not state lands and the state refused to receive his rent.
As we look at it, this whole question as to the title to land in that vicinity was settled between the state and the Nolan grantees by the Stimson-Nettleton survey. The state and these grantees were the only persons interested and when they undertook to settle that question and ran a line and for fifteen years abided by it, we do not think it is open to the squatters to question the effect of that survey and the title of those two parties, one or the other of whom must certainly have it, The city is not complainiug of the Whit *298 man judgment, and therefore, we are under no necessity to disturb it, and while we do not believe that Whitman was entitled to recover what he did, we shall refuse to disturb the judgment on that consideration.
Respecting the Norris judgment, as we have already suggested, we are compelled to reverse it because of the error apparent on the face of it. When the case goes back for further proceedings however, Norris’s recovery will undoubtedly under this decision be limited to the value of the portion of fractional lot 27 which was granted to him. As to the balance of that lot south of the Stimson-Nettleton survey, we believe the title is in the grantees of the Nolan heirs and therefore in the city, and that Norris can recover nothing for the taking of that land or for the destruction, or the taking oE the structures which he put on it with full notice of Iris want of title. They were built without right. We think the record establishes the Nolan grant. What Norris did was done as a trespasser and he cannot recover compensation for the taking of the buildings by the city. In this respect therefore, the judgment which refused to give him the value of those buildings is right, and the same rule will be followed in the subsequent trial.
The judgment is therefore reversed as to the plaintiff in error Norris whose damages must be assessed within the limits of the rules expressed in this case which are substantially in conformity with those adopted by the trial court. As to the plaintiff in error Whitman, the judgment will be affirmed.
The judgment of the court below therefore is affirmed in part, and reversed in part.

Reversed.